Good morning your honors and may it please the court. My name is Matt Kinney representing EPIC, the Environmental Protection Information Center. I would like to reserve three minutes for rebuttal. Okay keep track of their block and we will try to help. Thank you. EPIC requests a preliminary injunction of six timber sales offered as part of the Ranch Fire Roadside Hazard Tree Project because the Forest Service categorically excluded them from review in an environmental assessment or sales cover 7,000 acres removing 40 million board foot board feet of timber which fills 8,000 log trucks. Now the requested injunction was crafted so it would still allow the felling of trees with an immediate risk to roadways as has occurred on the roads since they were open but before the timber sales commenced and some have still not are far from over and so the Forest Service can deal with those trees as they have been doing during the pendency of the preliminary injunction. Now the Forest Service refused to prepare an EA an environmental assessment for these timber sales avoiding the 250 acre limitation of its commercial salvage timber sale rules under NEPA by relying on a category the D4 category for repair and maintenance of roads. Now examples of these projects allowed by the rule include activities such as pruning vegetation and clearing the roadside of brush nothing the sale of a commercial timber sale and under this court's decision in West versus the Secretary of Transportation an action must be similar in scope to the examples provided in the categorical exclusion. Now the plain language of the D4 category not only shows that it's inapplicable but the comment period for the rule never indicated anything of the scope of a timber sale and rather it said it was for activities with little surface disturbance. Now it's the environmental impact of a project not its purpose that is relevant for determining what level of NEPA is required. The Council on Environmental Quality Regulations at 40 CFR 1508.4 defines a categorical exclusion as a category of actions that have no significant effects and have been found to have no significant effects by the agency. And the importance of having an EA versus just a categorical exclusion is not only the more thorough discussion of environmental impacts but the discussion and consideration of alternatives or for instance more logs might be left on the ground in place for wildlife and where the agency has done an EA for roadside. If I interrupt for just a minute and this is Judge Fletcher I'm trying to understand exactly what the degree of logging that is permitted under the Forest Service policy here. I understand it's 200 feet for much of this 200 feet on either side measured from the center line of the road. Yes. And then there's a provision about one and a half times the height of the tree. Could you explain the one and a half times the height of the tree provision for me? Yes your honor my understanding is that logging can occur up to 200 feet from the center line of the road but the only trees to be felled would be those that are one and a half times the distance from the road. So if we had a 40 foot tree that is 60 feet from the road that would be felled but a 40 foot tree that's 80 feet from the road would not be felled is my understanding. Okay that's what I understood but the wording of the project was a little less than clear. I got the one and a half and I inferred that that was so and the Forest Service can confirm if that's in fact the yeah I wasn't sure exactly either until the preliminary injunction hearing where we sorted that out because okay yeah and the Forest Service can agree or disagree but that that was my inference but the wording of didn't quite say that it almost said that. Right thank you. So I was discussing how the benefit of having an EA is that you can have an alternative and we saw in the example we gave of where the Forest Service has done an EA and we provided several in our reply and one in our opening but the Paiute Roadside Project that's at the excerpts of record at page 229-231 has a discussion of an alternative that would leave more logs in place and that's exactly what kind of consideration that we are seeking here. It wouldn't mandate that logs be left in place but at least an EA would allow that to be considered. Now in contrast with the D4 category, the E13 category limits harvest... Before you go to E13, just staying on D4, I understand your argument the scope and impact but in terms of just the language of D4 regarding the maintenance of roads, just understanding that language would that cover what the Forest Service is doing now setting aside the scope? No, it wouldn't because it has to fit the examples. Clearing brush and pruning vegetation. Now if that's what you mean by scope then I suppose that's what we're talking about is the scope rather than the actual activities. Like there's no doubt that the Forest Service, if a tree is hanging over the that the Forest Service can cut it down, leave it by the side of the road under D4. That is a maintenance of road that would be included in the scope of clearing of brush say. A log, you know, a tree itself might be included in that but that is a wholly separate action from a commercial timber sale. Did I answer your question Judge Lee? Yeah, I think so. Could, if there weren't a commercial timber sale here, could the Forest Service do itself and cut down the trees as proposed? Yeah, well that does present the most, I think, difficult hypothetical for either side. If the Forest Service was to cut down the trees, leave them in place, it's theoretically possible but, you know, I would still say it really exceeds the scope of a categorical exclusion to do so on thousands of acres with that many logs. But this is not such a difficult question where it's a commercial timber sale. The logs are actually being removed and not being left for wildlife purposes and it's covered by other categorical exclusions that cover commercial timber sales. Now, I'm not sure I fully follow what you're saying. It may well be that the adverse environmental impact is less if the Forest Service does its own cutting and then leaves the logs there and agnostic as to whether that's a good or a bad environmental effect. But that doesn't make it one way or the other as to whether or not it comes within the exclusion for maintenance by the side of the road. If they're cutting back up to 200 feet, whether they take the logs away or don't, it doesn't seem to me it makes a difference with respect to whether it comes within the exclusion. I mean, that's a question not before us, I get it. But I don't see that it makes any difference with respect to whether or not it comes within the scope of the exclusion. Yeah, I mean, I would still say it does not come within the scope, but it presents a much, I think it's a more difficult question than we have here where the fact that it's a commercial timber sale that removes logging removes any question. Well, it's a more difficult question only in the sense, I think, that Judge Noonan used to invade against, which was to say, I'm not sure you're familiar with Judge Noonan's view of the Forest Service and timber sales in environmental cases. He used to complain vigorously that the Forest Service was making money out of these things and it was hardly a neutral arbiter deciding whether or not it was complying properly with the various legal requirements. Actually, I'm familiar with that. I probably should have cited it in my brief. Oh, you didn't need to. I knew it. But that one, to me, well, it's sort of backdrop. In a sense, it's irrelevant. The system is set up. The Forest Service didn't set it up. The Forest Service does get the money from the sales. I mean, the Forest Service is not behaving improperly and taking the money. That's the way the law is. But I understand the incentives to the Forest Service may be different depending on whether or not it's commercial logging or it just cuts the logs and they fall and stay in the forest. I get that. Okay, thank you. Now, as to the Category 13, what makes it especially apparent that this doesn't fit the D4 category is the fact that the Forest Service has a set of categorical exclusions that are designed for commercial timber sales. There's three different ones, 12, 13, and 14. E13 covers salvage sales. During the rulemaking for the E13 category, it said it was to include salvage sales, even ones that have a salutary effect. It might be positive in certain cases if you're doing thinning or something, but still limited the commercial timber sales to 250 acres. So even if E13 didn't exist, it wouldn't fit the scope of D4. But the fact that E13 exists shows even more so that a project over 250 acres cannot be exempted under some other rule because the Forest Service itself said we can only exclude commercial timber sales of salvage sales up to 250 acres. And there's a practical difference between logging and road maintenance regarding that would leave logs in place. When you do commercial logging, you have heavy equipment that has logs skidding and impacts on soils and other impacts. And as we've discussed, it removes down logs that might otherwise be needed for wildlife. I only have a minute left before I reserve my time. So I want to get on to the irreparable harm and equities. EPIC has shown that its members would suffer irreparable harm by not being able to enjoy the forest in its unlogged state. This court's decision in Alliance for Wild Rockies versus Cotrell holds that pretty clearly. And on the equities and public interests, we've crafted our request so it would still allow the felling of trees that pose an immediate risk, just as the Forest Service has been doing since the roads have been opened, but before the timber sales have come through. It has the ability to do that. And we've shown that an EA can be completed in just a few months. So while if the agency wanted to allow, wanted to get the case over with, it could do an EA and get back to it if it decided after that process that it still wanted to go forward with the sales. And I'll reserve the rest of my time if I may. Thank you. Let's hear from the other side. Your Honor, may it please the court. Jeff Clark here from the Justice Department on behalf of Forest Service. Ms. Ghaffori for the timber company will take five minutes. I will start by responding, I think, in order to the points that Mr. Kinne made. Let me start with this point that the sales should have been limited here or the project should have been limited to imminent hazards. The record reflects that the Forest Service looked at that carefully. If you look at the Carlson Declaration on ER pages 130 to 131, the chief here found that the plaintiff's solution simply wouldn't work. There were silviculturists who were trained to look for the relevant trees that are dangerous. And they assessed them based on special marking guidelines that have existed in two different sources since 2011 and 2012. There is no expert testimony to the contrary in the record. All that the plaintiff's put in really was a declaration about standing from Kim Baker of EPIC. And she has the job title public land advocate. Yeah, I'm not an expert, but it does occur to me to ask, what's the danger to the road of a tree that is 59 feet away from the road that's 40 feet high? So, your honor, you'd raised the earlier question of what about the criteria for taking down trees. And you mentioned too, the 200 foot from the center line of the road, the one and a half heights of the tree from the start of the road, right? So the center of the road is not the full road. So that's why you have the extra 1.5 times tree height category. So I think the nature of your question was you were suggesting maybe they're removing trees that aren't tall enough to fall into the road. No, that's not the case. Each of the criteria for removing the trees is additive. You have to meet all of them in order to remove them. So you have those two criteria. You also have the fact that the trees have to be merchantable. They have to be 14 inches or higher at breast height. You have the fact that they have to have a 50% mortality chance of dying. And also there are other restrictions, all of which again, all of them have to be met. They have to be a certain number of, it can only be a limited number of down logs per acre that leave a number of snags behind that don't disturb northern spotted owl nests. Rock outcroppings can interrupt and then block trees from being taken down. That's an SER 20. And some debris has to be left on the ground in order to avoid soil damage. That's an SER 24. So there are a host of restrictions here. It's not just based on tree height. It's not just based on the 200 foot center line requirements. But what I'm trying to figure out though, is the degree of danger of the trees that may be cut pursuant to this contract. And it seems to me that the degree of danger is minimal to non-existent for some of the trees that are at some distance from the road, even given the sense that the measurement is from the center line of the road. So, Mr. Fletcher, respectfully, I disagree with that. I think the Forest Service clearly disagrees with that. The additive nature... I understand the Forest Service does disagree, but I'm not yet convinced. So please convince me. I'll do my best, your honor. So, you know, what I would say again, is that you have these multiple restrictions, right? Again, it's not just purely about the height. And you're not talking about trees that would have no probability of reaching the roadway. The district has also found that this is a very carefully limited project. Also, in terms of the probability of the tree dying, the two sources that were applied were the Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest region from Angwin, 2012. That's an SCR 66-81. And then the SCR 23-24. And also the Marking Guidelines for Fire-Injured Trees in California from Smith and Clark, 2011 at SCR 26-65. So the scientists at the Forest Service applying well-established criteria are deciding whether there is a risk of these trees falling into the road. They are not overly including trees that are not at risk of falling on the road, your honor. There's a very adequate record here for the Forest Service's scientific and expert determination. So what's the chance of a tree that is, let's say, 51% burned, so it fits the criteria. It's 60 feet back from the road. What's the chance of that tree actually causing a hazard? There is certainly a positive probability of that, your honor. And I think that perhaps EPIC thinks that they can stand in the shoes of the Forest Service's expertise. But again, there are about eight different criteria that limit which trees can be cut. I'm not sure you're answering my question. Let me detail it a little bit. The tree that I've just imagined for us is maybe going to die, maybe not. The 50% burn is designed to evaluate some criteria, then the chance that it will eventually die. So first it has to die. And then after it dies, it has to fall over in the direction of the road. Yes. Now, I've been in the woods a lot. I grew up in the Northwest. I felled trees myself. I salvaged logging cases. So I mean, while I'm not an expert, I do know the field a little bit. For this tree that I've just hypothesized to fall onto the road, the chance of it's actually doing so is, I would say, minimum. Because it has to die. Once dead, it has to fall over and in the direction of the road. We're all familiar with dead trees that stand as snags. If that tree were to die and were to fall on the road, that's probably 25 years off. So, Your Honor, again, respectfully, I don't think that's the case. But the Forest Service balanced... Why don't you think that's the case? I don't think that's the case because the Forest Service looked at the probability and they applied the existing scientific criteria that exist. Those scientific criteria for felling trees, for marking trees that are at risk of also... I think they're right. I think there's a chance that the tree will die. And there's a chance that once the tree is dead, it will eventually fall over. And there's a chance that it will eventually actually fall over directly to the road, such that the tip of the tree might fall, might come onto the road. I get all of that. I'm not falling at all with any of those assumptions. I get your point there, Your Honor. But again, the point is that they didn't decide to fell all of the trees. So they had the 50% mortality criteria. So that's going to limit to half the trees right there. Then they have to be within a certain distance of the road. That's a further limitation. You're not responding by hypothetical. I'm saying, as to this tree, what's the chance of it's actually coming onto the road? And you're saying that they don't cut the other trees. I get that. You're not quite responsive. Well, Your Honor, respectfully, I think that if you have about eight criteria, all of them have to be met. The concentric circle of the number of trees you can cut with each successive criteria, it also has to be met, gets smaller and smaller and smaller. And the kind of hypothetical you're imagining of, there's some tree that may take a long time to die, et cetera, because it only meets two of the criteria. I just think that that is the kind of area where, for scientific reasons, given that the Forest Service has the expert civil culturalists, that administrative law requires that courts should defer to that unless there's contrary record evidence. And I don't think there is any. There's no contrary expert testimony. There's no contrary evidence. They apply the relevant guidelines. Okay. Okay. So let me cover some of Mr. Kinney's other points. Let's talk about D4, since you talked about the text of the relevant categorical exclusion that was applied. And Judge Lee had asked about that. And we think that that text clearly applies because we're talking about hazard trees. And we've just spent a long time, Judge Fletcher, obviously talking about the determining what is a hazard tree. I think that categorical exclusion clearly applies by its text. Mr. Kinney's contrary argument is essentially making an analogy to field preemption. It's essentially an argument that E13 occupies the field as soon as you have a commercial timber sale such that you can only apply an explicit commercial timber sale categorical exclusion. And I've counted the number in D, in E, and in 7 CFR Part 1.B3, where there are also some categorical exclusions. If you count the subcategories, there are a total of 133 categorical exclusions. And there's no necessary reason why there can't be overlapping ones. Indeed, the Forest Service has explicitly said that. So there's no reason why E13 should be something that's a master categorical exclusion or a trumping categorical exclusion. The whole point of Mr. Kinney's challenge, your ethics challenge, is to try to establish that E13 is somehow exclusive whenever you have a timber sale component. When in reality, this court held in the Native Ecosystems case, that if you're using a timber sale, that is simply incidental oftentimes to the project. Here, the project, again, it's very carefully limited, is to remove hazard trees. And given that nature, the Forest Service is simply using this limited way, because they're one program that they're actually paying to have the trees removed. They're using the self-funding mechanism of selling the trees that they cut down so that they can afford to get all of the hazard trees cut down and protected. With that, I'll hand it over, I think, to Ms. Gufori. Thank you. Thank you. Thank you. May it please the court, Sarah Gufori, on behalf of Defendant Intervenor Sierra Pacific Industries. I want to focus my argument on the merits prong and whether the activities authorized under the Ranch Fire Project fall within the scope of D4. But first, I want to directly address some of the questions asked by Judge Fletcher. With respect to the one and a half tree distance, if we look at the supplemental declaration from Tony Saba and the specific SER 19, he explains that that extra half height distance was to account for things like slopes. So if a... Excuse me, Judge Fletcher, my computer tells me it's rebooted. It'll take about seven minutes to do that. Okay. Apologize. Not... Let's see. I guess everyone hold their thoughts. We'll do whatever we need to do, Judge Settle, to get you set up again. And then we'll start again. I'm not sure about the technology on this one. Kwame, are you with us? Yes, I'm right here, Judge. So everybody sort of hold the phone. We'll get Judge Settle reestablished and then we'll resume again. Sounds good. We'll go ahead and mute the stream. Should we stop our video? I'm not sure Kwame's here. I'm here. I think just go ahead and leave your video going for now. I'm stopping the stream. To clarify, the stream is not stopped. The audio to the stream is though. So anything anybody says, it will not be heard on the stream. Okay. Judge Settle is joining. Judge Settle, do you hear me clearly? I can. We're back on. Great. Judge Fletcher, one moment while I re-enable the audio and then I'll let you know when we're ready to go. Okay. Your Honor, may I respectfully request some additional time given the disruption? Yeah, we'll take care of you. Thank you. You're all set, Judge. Okay. Now, the initial plan had been for you to have five minutes. The first lawyer went a little bit over. Let's start the clock for you at five minutes and you can just start from the beginning. Will that work for you? Yeah, I'll just begin with my introduction and introduce myself and then go into my argument. I've never heard from you again. We're just starting over. So you can start from the beginning with five minutes. Okay, great. Thank you. May it please the court, Sarah Ghaffori on behalf of Defendant Intervenor Sierra Pacific Industries. I'd like to focus my activities authorized under the Ranch Fire Project fall within the scope of the road venant's categorical exclusion. But first, I'd like to directly address some of Judge Fletcher's questions. With respect to the one and one and a half tree heights distance criteria regarding the removal of hazard trees, if we look at the supplemental declaration of Tony Saba, he explains that that additional half a tree height distance was added to account for things like 70 foot tree would only be felled if it was 105 feet away from the road. In response to your question about the 50% probability of mortality. Can I come back to the slope question? Certainly, Your Honor. Does the authorization to cut actually talk about slope? Or is it in some slope cases, it might be useful because if the tree is there, if the road cut into a hillside, and the tree we're cutting is uphill from the road, it might slide down. Does the restriction, but one and a half take into account slope and say this matters when there is a slope? Or does it not speak to slope? No, Your Honor, it just generally accounts for slope throughout the project area. So if you look at the authorizations, the three criteria state that there's a 200 foot treatment boundary, it needs to exhibit a 50% probability of mortality, and it needs to be one and a half tree heights distance. And it doesn't need to make a site specific determination that slopes would be that exist that to account for that extra half a tree height distance. In other words, if we if we're, if the road that we're talking about for the tree, that may be permissible under this authorization, because I think it is. And can you tell me a reason why it isn't? I think given the nature of this, the size of this project, given that 280,000 acres have burned, and there is about 3,691 acres of treatment, the agency has developed this broad criteria to capture the hazard trees that are most likely to strike the road. But the answer is the regulation in terms of what the authorization to cut actually doesn't say have a look at the slope. There may be some circumstances in which slope may be an issue. Can you tell me what the average size of these trees is in the area that we're talking about? Yes, Your Honor, the average tree height is 100 feet. So 100 feet, let's just take average trees and cut that tree back 150 feet from the road, whether the road is on flat ground, slope ground, whether the tree is uphill or downhill. If it's 100 feet from the road, it's 150 feet from the road, and it's 100 feet tall. The top of that the tip of that tree isn't going to come even to the edge of the road, correct? In some circumstances, it may if there is a slope, and in some circumstance, it might not or it could roll onto the road. It might not strike the road, but this authorization is accounting for trees that may fall onto the road as well. Let me ask you about the roll onto the road. If it's going to roll onto the road, that means it had to fall parallel to the road, correct? Potentially, Your Honor, yes. What do you mean potentially? Yes, Your Honor. And if it's going to fall parallel to the road, and that's 100 feet back, I think it is even a non-expert is going to say that log is not going to roll 100 feet onto the road. Even with a slant, it's not going to roll onto the road. Your Honor, this criteria was developed in accordance with the agency's marking and possibility of certain trees being a distance from the road that may strike the road. And this criteria really puts limitations on which trees can be removed and not allow a free-for-all harvest. I'd like to turn my argument to the regulatory text, if I may, Your Honor. The repair and maintenance of roads categorical exclusion is limited to those activities that have a nexus with an existing road corridor and a nexus with maintenance. Epic contends that it's the commercial aspect of these sales that makes it fall outside the scope, but there's no basis in the regulatory text to support the contention that commercial harvest is somehow prohibited. And there's no reference as to how maintenance work may be done. We respectfully request that this court affirm the district court's decision below. Thank you. Your timing is excellent. Okay. Thank you. Thank you. Thank you very much. Mr. Kenna, your microphone is off. Thank you. I'd like to address Mr. Clark's statement that, which is a correct one, that only trees up to 14 inches in diameter need to be removed under the contracts. And in fact, the excerpts of record at page 156 at the bottom plainly states that timber contracts do not require removal of non-merchantable trees under 14 inches. So, and then the goes on to say the forest service will come back later and clean it up. So what this showing is this is a commercial timber sale. They don't even have to remove the hazards that are under 14 inches. The forest service takes care of that, which also goes to our point about what could happen during the pendency of a preliminary injunction. We pointed out that the forest service can take care of any trees that are going to imminently fall during the few months it takes to prepare an EA. Mr. Clark says that's asking to stand in the shoes of the forest service, but it's not. We simply are pointing out that the agency has the ability to deal with hazards while an EA is prepared. Can you tell me, based on what's in the record, how tall a tree will be if it's 14 inches of DBA? Your Honor, I don't know the answer to that question. But if you'd like, I can submit something to the court after argument. If it's in the record, I'll find it. What I'm trying to figure out is how tall that tree is. There's a 14 inch in diameter tree, 80 foot tree, 100 foot tree. I'm trying to figure out which trees they're going to be cutting based upon that criterion. Okay, but you don't know the answer. I don't know the answer to that. I'm sorry. Not a problem. Mr. Clark referred to the native ecosystems case from this court, which talked about a commercial timber sale being an aspect of a project. Didn't define it for purposes of what alternatives the agency must consider. But as we detailed in our reply brief, when an agency is considering which alternatives it must look at, of course the purpose is important there. If the purpose is to reduce fire risk, it doesn't have to consider an alternative that increases fire risk. But that has no relevance for determining the level of preparedness. This is talking about which alternatives need to come up. So for instance, if the Forest Service did an environmental assessment here, of course it wouldn't need to consider an alternative that wouldn't abate the hazards. But we're talking about something very different. My time is about up, and unless any one of your honors have any more questions? Okay, any further questions from the bench? No, thank you. Thank both sides for their argument. The case of Epic is now submitted for decision, and we're adjourned. Thank you very much. Thank you.
judges: W.fletcher, Lee, Settle